Mohammed HUSSAIN, Plaintiff,

v.

Anthony PRINCIPI, Secretary, Department of Veteran Affairs, Defendant.

No. CIV.A.03–0367 (ESH).

United States District Court, District of Columbia.

Oct. 28, 2004.

Frederic M. Brandes, Timonium, MD, Tony O. Shaw, Dawn V. Martin, Washington, DC, for Plaintiff.

Charlotte A. Abel, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff, a male Muslim employed by the Department of Veterans Affairs ("VA") for twenty-five years, has brought an employment discrimination suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, alleging discriminatory failure to promote, retaliation, hostile work environment, and constructive discharge based on his race, religion, and national origin.[1] Defendant has moved for summary judgment. For the reasons set forth below, the Court concludes that defendant's motion should be granted.

1. Although plaintiff's opposition to summary judgment also makes reference to age discrimination, his second amended complaint fails to allege such a violation.

2. The parties' briefs and the record refer to this department interchangeably as "Radiation Therapy" and "Radiation Oncology." . It appears that the name of the department was changed to "Radiation Oncology" after it became part of the Radiology Service. (Pl.'s Ex. W–1 (Memo from Mr. Garfunkel, Director).)

## BACKGROUND

### I. Factual Background

Plaintiff is a "dark-skinned" Muslim who was born in India. He joined the Washington D.C. Veterans Affairs Medical Center ("VAMC") as a physician in 1978. At that time he held the title of Assistant Chief of Radiation Therapy[2] and was supervised by Dr. Steven Lunzer, Chief of the Radiation Therapy Service. (Pl.'s Ex. A (hereinafter "Hussain Aff.") ¶¶ 1, 5–6). Plaintiff was responsible for treating cancer patients undergoing radiation therapy. In annual performance reviews, Dr. Lunzer consistently gave plaintiff ratings of "high satisfactory."[3] (Pl.'s Ex. B.)

Dr. Lunzer retired in 1997 and plaintiff was appointed Acting Chief of the Radiation Therapy Service. The position of Acting Chief demanded more administrative responsibilities, but was not accompanied by a pay raise. (Hussain Aff. ¶¶ 21–22.) As Acting Chief, Dr. Hussain reported directly to the hospital's Chief of Staff, Dr. Fletcher. (*Id.* ¶ 28.) Dr. Hussain was the only physician in the Radiation Therapy Service from Dr. Lunzer's retirement in 1997 until 2001. (*Id.* ¶ 21.) During this time, he indicated to hospital officials an interest in becoming permanent Chief of the Radiation Therapy Service, but his requests went "unanswered." (*Id.* ¶ 24; Pl's Ex. O–2 (1999 Letter to Dr. Sapagnolo, Chief of Staff).)[4]

To avoid confusion, the Court will refer to the department only as "Radiation Therapy."

3. Possible ratings included "low satisfactory," "satisfactory," "high satisfactory," or "excellent."

4. Dr. Sapagnolo was Chief of Staff until May 1999, when Dr. Fletcher was appointed to the position of Acting Chief of Staff. Dr. Fletcher was made permanent Chief of Staff in January 2000.

On September 26, 2000, the Director of VAMC, Mr. Garfunkel, distributed a memorandum informing all employees that, beginning October 15, 2000, the Radiation Therapy Service would be merged with the Imaging Service to create a unified "Radiology Service." (Pl.'s Ex. W–1 (Memo from Mr. Garfunkel, Director).) Dr. Klemens Barth, then Chief of the Imaging Service, was appointed Chief of the newly created Radiology Service. The hospital did not advertise or form a search committee for this position. (Hussain Aff. ¶ 32; Fletcher Aff.; Garfunkel Aff.) After the merger, Radiation Therapy became a "division" within the Radiology Service, rather than an independent "service." (Pl.'s Ex. W–1.) Plaintiff remained Acting Chief of Radiation Therapy, but now he reported to Dr. Barth, who in turn reported to Dr. Fletcher. Plaintiff's duties, compensation, and supervisory responsibilities remained the same, as did the division's budget and staff. (*Id.*)

On November 29, 2000, plaintiff filed an informal Equal Employment Opportunity ("EEO") complaint pursuant to 29 C.F.R. ch. 1614, claiming that he had been denied promotion to the permanent position of Chief of Radiation Therapy and "demoted" by way of the merger on the basis of his race, age, religion, and national origin. (Pl.'s Ex. S.)

In January 2001 plaintiff received a memo from Mr. Garfunkel stating that he "*may* be reported" to the National Practitioner's Data Bank ("NPDB")[5] as a result of a medical malpractice claim settled by the VAMC in March 2000.[6] (Pl.'s Ex. J–25 (emphasis in original).) The patient's claim was based on lack of informed consent for undergoing radiation therapy. Hospital administrators had identified plaintiff because he was the physician responsible for informing the patient of the risks associated with this procedure. (Def.'s Ex. 3 at 6; Fletcher Dep. at 166.) Pursuant to hospital protocol, the hospital had submitted plaintiff's name to the VA "Peer Review Panel" in Buffalo, which would then determine whether reporting to the NPDB would be appropriate. (Fletcher Aff. ¶ 4; Def.'s Ex. 3 at 3; *see* Def.'s Reply at 8.) Also in January 2001 Dr. Fletcher submitted a letter to the Peer Review Panel stating that plaintiff did not provide substandard care and recommending that plaintiff *not* be reported to the NPDB. (Pl.'s Ex. BB (email from Dr. Fletcher to Dr. Hussain); Def.'s Ex. 3 at 2 (letter from Dr. Fletcher to Medical–Legal Affairs Department).) The Peer Review Panel, finding no deviation from the standard of care, decided not to report Dr. Hussain to NPDB. The matter ended there. (Pl.'s Ex. CC (memo re: Conclusions of Review Panel).)

On February 14, 2001, plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting the same claims as his initial EEO complaint. In addition, plaintiff claimed that the hospital had submitted his name to the Peer Review Panel as retaliation for filing his earlier EEO complaint. (Pl.'s Ex. T.)

Since Dr. Lunzer's retirement, Dr. Hussain had been complaining that his department was short staffed, causing him to be "on call" 365 days a year. (Hussain Aff. ¶ 21.) In July 2001, Dr. Barth hired Dr. JoAnn Manning, an African American fe-

---

**5.** NPDB is a database managed by the United States Department of Health and Human Services intended to restrict the ability of health care practitioners to move from state to state without discovery of previous malpractice.

**6.** Plaintiff asserts that VAMC reported him to the NPDB (Pl.'s Opp'n at 27–28), but the undisputed facts in the record clearly prove otherwise. (*See infra* note 25.)

male, as an additional staff physician in the Radiation Therapy Division.[7] (Pl.'s Ex. U.)

Between July 2001 and December 2001, plaintiff did not receive approximately $23,000 in "special pay" to which he was entitled. (Hussain Aff. ¶ 55.) Plaintiff discovered the problem in January 2002 when he received his W–2 tax form for the 2001 calendar year. Plaintiff concedes that the error originated in his failure to renew his special pay contract with the VAMC's Human Resources Department. (Hussain Dep. at 98–105.)

In October 2001 plaintiff received his first performance review since Dr. Lunzer's retirement. Dr. Fletcher, who conducted the review, gave plaintiff a "satisfactory" rating, stating that "many issues have arisen regarding Dr. Hussain." (Pl.'s Ex. NN–2.) Plaintiff's next performance review, conducted by Dr. Manning and approved by Dr. Barth in August 2002, gave him an overall rating of "low satisfactory." (Pl.'s Ex. PP.) Among other comments, Dr. Manning stated that Dr. Hussain did "not provide an effective leadership for the division." (Id.)

On December 20, 2002, Dr. Barth appointed Dr. Manning as Chief of Radiation Therapy, with Dr. Hussain remaining as Acting Chief only in her absence. At this time, Dr. Manning became Dr. Hussain's supervisor and his title reverted back to that of Assistant Chief. Dr. Hussain's compensation and duties remained the same, except that he was relieved of his administrative responsibilities. (Pl.'s Ex. N.) Dr. Manning took on these responsibilities but did not receive a pay increase. (Manning Aff. ¶ 4.)

As Chief of Radiation Therapy and Radiology respectively, Dr. Manning and Dr. Barth encountered a number of problems with Dr. Hussain's performance. (Manning Aff.; Barth Aff.) One of the issues of most concern was his failure to conduct adequate follow-up with radiation therapy patients. Though the American College of Radiology ("ACR") Standards for Radiation Oncology provide that follow-up evaluations by the radiation oncologist are "essential," Dr. Hussain believed that patients need only see their primary treating clinics for follow-up care. (Def.'s Ex. 2 at 11 (4/28/03 email from Dr. Hussain to Dr. Manning) and at 14 (ACR Standards).)[8] Apparently as a result of this concern, Dr. Hussain's clinical privileges were renewed "with modifications" in June of 2003. (Def.'s Ex. 4 at 2.) The modifications provided that Dr. Hussain would be required to document the results of weekly examinations of his patients and that documentation would be reviewed monthly. His privileges were renewed for a three-month period rather than the normal two-year period. (Id.) Upon review of the required documentation in August 2003, Dr. Barth and Dr. Manning found "an alarming pattern ... that Dr. Hussain finds it appropriate to copy and paste other physicians [sic] assessment into electronic patient record without giving evidence that he has actually seen and examined the patient prior to, during, or after treatment." (Def.'s Ex. 4 at 5.) On August 26, 2003, Dr. Barth informed Dr. Hussain, who at the time was on extended medical leave, that his clinical privileges would be extended for one month, but upon returning from medical leave, he would have to fully com-

---

7. Dr. Barth extended an unofficial offer to Dr. Manning in July 2001. It is unclear from the record when she received her official offer or began working at VAMC, but it appears to have been sometime in the fall of 2001.

8. Dr. Hussain was provided with a copy of the American College of Radiology Standards in November 2002 as a reminder. (Def.'s Ex. 2 at 4.)

ply with ACR guidelines to extend his privileges further. (Def.'s Ex. 4 at 1.)

Dr. Hussain began his extended medical absence on July 28, 2003. The next day he provided a letter from his doctor stating that "extended sick leave [was] necessary until further notice." (Pl.'s Ex. TT.) The letter stated that "his emotional state doesn't allow him to continue to be exposed to the very stressful work environment" and recommended reevaluation at one-month intervals. (*Id.*) On August 5, 2003, Dr. Manning informed Dr. Hussain that she could not approve his sick leave request beyond August 11 without further medical documentation. Dr. Hussain appears not to have responded to this request and was thus placed in "Absence Without Leave" status as of August 12, 2003.[9] (Pl.'s Ex. UU.) In September 2003 plaintiff opted for early retirement and left defendant's service. (Pl.'s Ex. WW.)

## II. Plaintiff's Lawsuit

Plaintiff commenced this suit in February 2003 and filed his Second Amended Complaint on November 7, 2003. The government filed its Motion for Summary Judgment on June 18, 2004. Over a month after this motion had been filed and three and a half months after discovery had closed, plaintiff moved to reopen discovery. (Pl.'s Mot. to Reopen Disc., July 9, 2004.) The Court denied this motion for lack of good cause, finding that the only reason no discovery had been taken was neglect by plaintiff's counsel. (*See* Tr. of July 22, 2004 hr'g at 17–18.)

■ Plaintiff, now represented by new counsel, complains that because "[t]here is little evidence in the record [and][n]o discovery has taken place," summary judg-

ment based on plaintiff's failure to produce sufficient evidence would be "tantamount to default judgment" and an unfair "penalty." (Pl.'s Opp'n at 37, 39.) The Court disagrees. Because discovery was closed and defendant had moved for summary judgment before plaintiff even moved to reopen discovery, and there was *no* legitimate reason why discovery had not yet been conducted, the Court had ample reason to reject plaintiff's motion. While "summary judgment should be entered only 'after adequate time for discovery,'" *Berkeley v. Home Ins. Co.* 68 F.3d 1409, 1414 (D.C.Cir.1995) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), plaintiff had more than adequate time for discovery here, but his counsel did not take advantage of it. The counsel who represented plaintiff during the discovery period conceded that "[t]here has been some lack of diligence," and in fact, he had "screwed up." (Tr. of July 22, 2004 hr'g at 4, 10.) Since "the non-moving party has not diligently pursued discovery of the evidence," this Court is under no obligation to grant belated requests for discovery, *Berkeley,* 68 F.3d at 1414 (internal quotation marks omitted) (quoting *Wichita Falls Office Assoc. v. Banc One Corp.,* 978 F.2d 915, 919 n. 4 (5th Cir.1992)), nor can plaintiff complain at this late date that he lacks the evidence to respond to defendant's dispositive motion.

■ Plaintiff also wrongly suggests that he has been completely deprived of discovery. While plaintiff may not have had a full administrative hearing, he did have an opportunity to obtain discovery at the administrative level regarding many of the

---

9. Dr. Hussain states that his "physicians followed all necessary protocols" to place him on medical leave, but does not specifically mention responding to Dr. Manning's request.

(Pl.'s Opp'n at 31.) Defendant contends that he never responded. (Def.'s Mot. at 15.) This dispute is, however, not material.

same claims he pursues here. Plaintiff was represented by counsel during the EEOC proceedings and took lengthy depositions of Dr. Fletcher, Dr. Barth and Mr. Garfunkel. (Fletcher Dep. (Mar. 1, 2002); Barth Dep. (Mar. 12, 2002); Garfunkel Dep. (Mar. 14, 2002).) These depositions covered the merger of the Radiation Therapy and Imaging Services, Dr. Barth's appointment as Chief of Radiology, the Peer Review Panel, the hiring of Dr. Manning, the administration's reaction to plaintiff's EEO complaints, and many other topics. Thus, plaintiff's protests of prejudice ring hollow, and the Court will proceed to consider defendant's motion for summary judgment.

## ANALYSIS

### I. Legal Standard

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Wash. Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. The non-moving party must provide evidence that

would permit a reasonable jury to find in the non-moving party's favor. *Laningham, v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95–2397(PLF), 1998 WL 164780, at *3 (D.D.C. March 31, 1998) (internal citation omitted), *aff'd*, No. 99–5126, 1999 WL 825425, at *1 (D.C.Cir. Sept.27, 1999).

Plaintiff claims discrimination based on disparate treatment, thus triggering the application of the *McDonnell Douglas* three-part "shifting burdens" test. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff has the initial burden of proving a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. 1817. To do so, plaintiff must establish: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody*, 199 F.3d 446, 452 (D.C.Cir.1999). If he succeeds, the burden then shifts to defendant to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* Its burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[T]he determination that a defen-

dant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."). If defendant is successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non.*" *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations and quotation marks omitted). At that point, plaintiff has the burden of persuasion to show that defendant's proffered nondiscriminatory reason was not the true reason for the employment decision. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *see also Morgan v. Fed. Home Loan Mortgage Corp.,* 328 F.3d 647, 651 (D.C.Cir.2003) ("[a]lthough the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal citations and quotation marks omitted).

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination, summary judgment must be entered against [plaintiff]." *Paquin v. Fed. Nat'l Mortgage Ass'n,* 119 F.3d 23, 27–28 (D.C.Cir.1997). Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089.

## II. Discrimination

It is undisputed that plaintiff is a Muslim who was born in India, and he therefore satisfies the first prong of *McDonnell Douglas.* His next task is to establish that he suffered an adverse employment action. Plaintiff's discrimination claim boils down to two alleged adverse actions: the creation of the new Radiology Service with Dr. Barth as its Chief and the appointment of Dr. Manning as Chief of Radiation Therapy.[10] Plaintiff does not allege that he lost pay or benefits as a result of these actions, arguing instead that they were "failures to promote" and that each resulted in him being "kicked down" a level in the hospital hierarchy. (Pl.'s Opp'n at 12–17.)

To establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges of [his] employment." *Brody,* 199 F.3d at 457. An "employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA,* 102 F.Supp.2d 24, 29 (D.D.C.2000) (citation omitted); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

**10.** In his opposition, plaintiff for the first time cites all the actions alleged in his Complaint as "retaliatory" as also being "discriminatory." The Court will consider these additional actions under plaintiff's retaliation claim. Since the success of each type of claim depends on first demonstrating that the actions were "adverse," and plaintiff cannot do so, it makes no difference whether they are cast as claims of "retaliation" or "discrimination."

## A. Nonselection As Chief of Radiology

■ Plaintiff suggests that the merger was an adverse action in part because it made Dr. Barth his supervisor and "bumped [him] down" a rung on the "reporting hierarchical ladder." (Pl.'s Opp'n at 17.) He proposes that "where an additional level of supervision is placed upon employees, it is a demotion." (*Id.* at 16.) Semantics aside, the real question is whether this "bump" constitutes "objectively tangible harm." *Brody,* 199 F.3d at 457. Contrary to plaintiff's assertion, courts have held that the appointment of a new supervisor alone is not an adverse action. *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C.Cir.2002) (reorganization which resulted in a former colleague becoming plaintiff's supervisor was not adverse action); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 457 (7th Cir.1994) (employee's change in title coupled with a new reporting relationship that required plaintiff to report to a former subordinate who was a manager rather than the senior vice president, to whom plaintiff had formerly reported, was not an adverse action).

■ To be an adverse action, a reorganization must result in a significant change in job responsibilities or benefits. *Forkkio,* 306 F.3d at 1131; *see Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *see also Jones v. Billington,* 12 F.Supp.2d 1, 13 (D.D.C.1997) ("[N]ot everything that makes an employee unhappy is an actionable adverse action.") (citation and quotation marks omitted), *aff'd without op.,* 1998 WL 389101, at *1 (D.C.Cir. June 30, 1998). Here, plaintiff himself states that his duties remained "*exactly*

*the same*" before and after the merger. (Pl.'s Opp'n at 17 (emphasis in original).) His pay, grade, and benefits were also untouched. (Pl.'s Ex. W–1.) The sole consequence of the merger was that Dr. Hussain reported to Dr. Barth instead of directly to Dr. Fletcher. (Pl.'s Opp'n at 16.) Thus, the reorganization alone was not an adverse action and cannot serve as the basis for a claim of discrimination.

■ Plaintiff also suggests that Mr. Garfunkel's "pre-selection" of Dr. Barth as Chief of the newly merged Radiology Service was an adverse action.[11] Plaintiff alleges that VAMC "did not consider Dr. Hussain for the position or allow him any opportunity to apply for it .... Dr. Barth was pre-selected for the newly created position." (Pl.'s Opp'n at 16.)

Some courts have analogized the failure to allow an employee to compete for a position to a refusal to promote. *Cones v. Shalala,* 199 F.3d 512, 521 (D.C.Cir.2000). To establish a prima facie case of nonselection or failure to promote, plaintiff must at least show that: "(1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone ... filled the position or the position remained vacant and the employer continued to seek applicants." *Lathram v. Snow,* 336 F.3d 1085, 1088 (D.C.Cir.2003) (internal quotation marks and citations omitted).

Defendant argues that there was no vacancy, and even if one had existed, Dr. Hussain never applied for it. (Def.'s Mot. at 7–8.) "Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff

---

11. Plaintiff also tries to frame this claim as one of "demotion." (Pl.'s Opp'n at 16.) Since the key question is whether the action was "adverse," regardless of how the personnel action is characterized, the Court will not consider the demotion allegation separately. *See Brody,* 199 F.3d at 455 ("[W]e are less concerned with the kind of employment action involved, than with its effect on the employee.")

from establishing a prima facie case of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer." *Cones,* 199 F.3d at 518 (quoting *EEOC v. Metal Serv. Co.* 892 F.2d 341, 348 (3d Cir.1990).) It is disputed as to whether Dr. Hussain made *any* "reasonable attempt" to convey interest in becoming Chief of the new Radiology Service. It appears that Dr. Hussain was focused mainly on maintaining the independence of the Radiation Therapy Service and becoming chief of that service. Hoping to forestall the merger altogether, Dr. Hussain may not have fully considered who would become chief of the merged service. Though plaintiff now contends he did want to be Chief of Radiology (Hussain Aff. ¶ 31), he does not produce evidence that he conveyed this interest to his superiors. Moreover, there is contrary evidence showing that plaintiff specifically stated that he did *not* want the position of Chief of Radiology. (Fletcher Dep. at 52.)

But even if plaintiff's assertions create a disputed issue of fact as to whether he "applied" for the position of Chief of Radiology, this dispute is immaterial given defendant's numerous legitimate, nondiscriminatory reasons for "pre-selecting" Dr. Barth to head the service.[12]

The idea of merging the two services had been percolating among hospital administrators for some time prior to Mr. Garfunkel and Dr. Fletcher's assumption of their respective positions as Director and Chief of Staff. Administrators were concerned that Radiation Therapy was having problems scheduling patients and preparing for the accreditation review by the Joint Commission on Accreditation of Health Care Organizations, and that, as Acting Chief, Dr. Hussain was not "actively visible" or "correcting" the problems. (Garfunkel Dep. at 32.) On the other hand, Dr. Barth was "a very strong advocate" for the equipment and resource needs of his Service. (Fletcher Dep. at 42.) The goal of the merger was to "aid administrative efficiencies between the two related services and assist Radiation Therapy in becoming a stronger clinical unit." (Garfunkel Aff. ¶ 3). As stated by Mr. Garfunkel, "[t]he final decision to merge the two services was based on the fact that Dr. Klemens Barth had done an excellent job running the large Radiology Service, would run the newly merged service, and was eminently qualified for the job." (*Id.*) In other words, the creation of the Radiology Service was conditional on Dr. Barth becoming chief.

Not only was Dr. Barth viewed as being far more capable than Dr. Hussain, if not "the best chief of radiology" that Dr. Fletcher had seen at VAMC (Fletcher Dep. at 50), he already was in charge of the Imaging Service, which was "far larger in scope, workload, and personnel" than the Radiation Therapy Service. (Barth Aff. ¶ 3.) At the time of the merger, the Imaging Service had ten times the budget of the Radiation Therapy Service and nine times as many practitioners. (Pl.'s Ex. W–1; Pl.'s Undisputed Facts ¶ 28.)

In addition to these legitimate, nondiscriminatory reasons for selecting Dr. Barth without advertising the position, defendant states that even if Dr. Hussain had been a candidate for the position, they would not have selected him. (Def.'s Mot. at 8.) According to Dr. Fletcher, "[the hospital] would hope [the service chief] to

---

**12.** The hospital administrators' reasons for making Dr. Barth chief go hand in hand with their reasons for effecting the merger. Thus, even if the merger were an adverse action, which it is not, plaintiff's discrimination claim fails unless he can show that these reasons are pretextual.

be a person who has academic credentials, is able to be a professor in their university, either Georgetown, G[eorge] W[ashington], or Howard, and is publishing on a regular basis as first author. And none of those criteria apply to Dr. Hussain." (Fletcher Dep. at 74.)

■ Defendant has more than met its burden of preferring a legitimate reason for selecting Dr. Barth as Chief of Radiology. It now falls to plaintiff to establish that the proffered reasons are a pretext for discrimination.[13] In trying to establish an inference of discriminatory intent, plaintiff disputes the hospital's characterization of his performance as Acting Chief of Radiation Therapy, claiming that the hospital is merely "blaming the victim."[14] (Pl.'s Opp. at 20.) Plaintiff misconstrues the legal standard. As unjust as the situation may seem to Dr. Hussain, the issue is not whether the hospital was *correct* in blaming the service's poor performance on plaintiff, but whether they truly believed that Dr. Barth would do a better job of turning the service around. "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C.Cir.1996.) As stated by the D.C. Circuit, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." *Id.* (quoting *Pignato v. Am. Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994)). Thus, plaintiff's attempt to show that his superiors were wrong about his performance does nothing to prove that their proffered reasons for choosing Dr. Barth were a facade. *See Waterhouse v. Dist. of Columbia*, 124 F.Supp.2d 1, 7 (D.D.C.2000) ("[P]laintiff's perception of h[im]self, and of h[is] work performance, is not relevant. It is the perception of the decisionmaker which is relevant.") (internal citation and quotation marks omitted), *aff'd*, 298 F.3d 989 (D.C.Cir.2002).

---

**13.** Though plaintiff focuses on Dr. Barth's "pre-selection" as evidence of the hospital's alleged scheme to undermine him, "pre-selection by itself is neither unusual nor illegal, much less egregiously wrongful. Indeed, where the selection is to be made from among a narrow band of current employees well known to the selectors, it is hard to see how there could not be a substantial degree of pre-selection—unless the decision-makers were asleep at the switch or the candidates' track records were virtually identical." *Kolstad v. Am. Dental Ass'n*, 139 F.3d 958, 969–70 (D.C.Cir.1998), *vacated on other grounds by Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). "Consequently, evidence of pre-selection is relevant only insofar as it logically supports an inference of discriminatory intent, i.e., trivially at best." *Id.* at 970. *See also Krodel v. Young*, 748 F.2d 701, 709 (D.C.Cir.1984.)

**14.** Plaintiff argues:
 The Agency has presented absolutely no evidence that the alleged *unidentified* 'problems' were caused, in any way, by Dr. Hussain . . . [A]fter refusing to allocate adequate funds to Dr. Hussain to hire any assistants or to purchase adequate equipment, and subjecting him to 'unbearable' responsibility for four and half years of running the department by himself, on call 24 hours a day, seven days per week, the Agency blames Dr. Hussain for the 'under-performance' of the Radiology Service.
(Pl.'s Opp'n. at 19–20.) But as noted by the Circuit Court, plaintiff's "responses constitute[] an argument that not withstanding those failings, the . . . [defendant] should not have terminated [him] because there were extenuating circumstances. . . . But courts are without authority to second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Waterhouse v. Dist. of Columbia*, 298 F.3d at 989, 995 (D.C.Cir. 2002) (internal quotation marks and citations omitted.)

Nor do plaintiff's assertions that he was more qualified than Dr. Barth because Dr. Barth lacked certification in "straight therapeutic radiology" or that "Dr. Barth came to the VAMC with no experience in Veteran's hospitals" raise an inference of pretext. In two opinions the D.C. Circuit has explained that, in a dispute involving relative job qualifications, discrimination will not be inferred absent a showing that plaintiff's qualifications are *far superior* to those of the successful candidate. For example, the Circuit noted:

> If a factfinder can conclude that a reasonable employer would have found the plaintiff to be *significantly better qualified* for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture.

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C.Cir.1998) (*en banc*) (emphasis added).[15] In contrast, in *Stewart v. Ashcroft*, 352 F.3d 422 (D.C.Cir.2003), there was no such evidence of "*stark superiority of credentials*" between plaintiff and the successful candidate for the position of Chief of the Department of Justice's Environmental Crimes Section. *Id.* at 429–30 (emphasis added). Stewart had more prosecutorial experience in environmental matters, but Uhlmann—the successful candidate—also had significant prosecutorial experience, with over twenty-five jury trials to his credit. *Id.* at 430. Stewart had two years of service as an Assistant United States Attorney, compared with Uhlmann's six months in that position. *Id.* The Circuit found that these "fine distinctions" were not sufficient to raise a jury question. *Id.*

Stewart's pointing to differences in qualifications that merely indicate a "close call" does not get him beyond summary judgment. This Court will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that race played a part in the decision.

*Id.; see also Edwards v. Principi*, 80 Fed. Appx. 950 (5th Cir.2003) (to show pretext, "a plaintiff [must] show a difference in his qualifications superior to that of the person selected so apparent as to virtually jump off the page and slap us in the face") (internal citation and quotation marks omitted). In short, it falls to plaintiff "to address the issue of *discrimination,* not to quibble about the candidates' relative qualifications." *Skelton v. ACTION*, 668 F.Supp. 25, 26 (D.D.C.1987) (emphasis in original), *aff'd*, No. 87–5353, 1988 WL 156306, at *1 (D.C.Cir. May 12, 1988).

As was the case in *Stewart,* plaintiff has failed to show "stark superiority of credentials" in comparison with the competition. *Stewart,* 352 F.3d at 429–30. Here, plaintiff's qualifications were not even equal to Dr. Barth's, let alone superior. Dr. Barth had served as manager of the significantly larger Imaging Service for several years, had published dozens of articles, and had several current university affiliations.

---

**15.** In that case, Aka's job qualifications were far superior to those of Valenzuela, the candidate selected for a hospital pharmacy technician job. *Id.* at 1299. Aka had nineteen years of experience handling pharmaceutical supplies, compared with Valenzuela's two months of volunteer work at a pharmacy. *Id.* at 1296–97. Aka had a master's degree in business and professional administration with a concentration in health service management, while Valenzuela had no college degree. *Id.* at 1297. Aka's credentials were sufficiently superior to those of the successful candidate to create a jury question as to whether the hospital's proffered reason for its decision was false.

(*Compare* Barth Aff. Attach. (Barth Resume) *with* Pl.'s Ex. P (Hussain Resume).) In terms of the hospital's criteria for chief of a large service, this was not even the "close call" that *Stewart* found insufficient to raise an inference of discrimination. *Stewart*, 352 F.3d at 430.

■ Plaintiff's remaining "evidence" of discriminatory intent is either irrelevant or incompetent. He asserts that another Muslim physician who had formerly worked closely with Dr. Fletcher repeatedly told him that Dr. Fletcher is a "racist." (Hussain Aff. ¶ 12.) He also "was told that" either Dr. Fletcher or Mr. Garfunkel "referred to Palestinian Muslims as 'uncivilized' and 'violent nomads'" at a meeting. (*Id.* at 16.) The Court can only rely on "competent" evidence to decide a motion for summary judgment. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. As these statements are nothing but hearsay, they do not create a triable issue of fact. Similarly, vague and conclusory statements cannot defeat summary judgment. Plaintiff refers to discriminatory "comments that he had personally heard [Dr. Fletcher and Mr. Garfunkel] make," but he provides no specifics. (*See* Hussain Aff. ¶ 16.) Moreover, "'stray remarks,' even those made by a supervisor, are insufficient to create a triable issue of discrimination where, as here, they are unrelated to an employment decision involving the plaintiff." *Simms v. U.S. Government Printing Office*, 87 F.Supp.2d 7, 9 n. 2 (D.D.C. 2000).

■ Plaintiff also repeatedly makes reference to the discriminatory behavior of Dr. Patel, the staff physicist in the Radiation Therapy Service. (Pl.'s Opp'n at 4, 36; Pl.'s Stmt. of Undisp. Facts ¶¶ 16, 18.)[16] Plaintiff does not contend, however, that Dr. Patel had anything to do with the hiring or promotion decisions of hospital administrators. Thus, whether Dr. Patel was prejudiced against Muslims is irrelevant to plaintiff's claims of discriminatory nonselection. *Hall v. Giant Food, Inc.* 175 F.3d 1074, 1079 (D.C.Cir.1999) (plaintiff cannot establish discriminatory motivation with evidence of one person's discriminatory remarks if that person is in no way involved with the decisionmaking process).

■ Plaintiff's attempts to link the alleged religion-based animus at the hospital to the promotion decisions of his superiors are also weakened by his inconsistent testimony during an EEO deposition. When asked what led him to believe that Dr. Barth's selection as chief was the result of discrimination, plaintiff replied, "I mean, that's only [sic] I can think of that, that it is racially motivated, you know, because I'm non-White and he's White." (Hussain Dep. at 143.) Guessing as to an employer's motivations does not provide the basis for a Title VII claim, for "[p]laintiff's mere speculations are 'insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment.'" *Brody*, 199 F.3d at 459 (quoting *Branson v. Price River Coal Co.* 853 F.2d 768, 772 (10th Cir.1988)).

In sum, plaintiff has not met his burden of showing pretext. Plainly, the merger was a way for the hospital to take ultimate responsibility for the Radiation Therapy Service out of Dr. Hussain's hands and put it into Dr. Barth's hands. However, there is no evidence to suggest that administrators made this decision on the basis of race, religion, or national origin. On the contrary, the hospital provides ample sup-

16. For instance, according to plaintiff, Dr. Patel "repeatedly criticized Dr. Hussain to coworkers ... for his belief in Islam." (Hussain Aff. ¶ 16.)

port for its claims that Dr. Barth was more qualified.

## B. Nonselection as Chief of Radiation Therapy

■ The Court now turns to the hospital's nonselection of Dr. Hussain as Chief of Radiation Therapy.[17] As noted above, to state a prima facie case plaintiff must show that: (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone filled the position or the position remained vacant and the employer continued to seek applicants.'" *Lathram,* 336 F.3d at 1088 (citations omitted). Defendant disputes that Dr. Hussain "applied for" the position at the time Dr. Manning was selected, viewing his "repeated requests to be made permanent Chief" merely as "veiled references to the position" and too remote in time to be relevant to Dr. Manning's appointment. (Def.'s Reply at 2.)[18] Viewing the evidence in the light most favorable to plaintiff, however, Dr. Hussain's expression of interest in this position was arguably sufficient to establish an "application." *See Cones,* 199 F.3d at 518. In April 1999 Dr. Hussain wrote to then Chief of Staff Dr. Spagnolo stating: "I am very much interested in the position of Chief, Radiation Therapy Service and I considered [sic] myself well qualified. Based on my service and qualifications I would like to be given a fair chance." (Pl.'s Ex. O–2.) In 2000 he wrote another letter to Dr. Garfunkel also expressing interest in the position. (*See* Pl.'s Ex. O–3.) In *Morgan,* an employee's expression of interest for a position in July was not sufficient to demonstrate that he had applied for the position again in November. 328 F.3d at 654. However, in that case, the Court noted that Morgan's employers were not aware that he still was interested in the position. *Id.* In contrast, there is evidence to suggest that plaintiff's superiors knew of his continued interest in becoming chief, but this issue need not be resolved, for plaintiff's claim fails for other reasons.

Assuming that plaintiff can state a prima facie case, the burden shifts to defen-

17. Plaintiff attempts to frame his non-selection for the position of Chief of Radiation Therapy during the four and a half years that he served as Acting Chief (1997–2002) as a separate "adverse action" from the eventual selection of Dr. Manning for the position. However, to establish a prima facie case of discriminatory non-selection, plaintiff must show that "either someone filled the position or the position remained vacant and the employer continued to seek applicants." *Lathram,* 336 F.3d at 1088 (internal quotation marks and citations omitted). No one filled the position, nor did the employer seek any applicants, until Dr. Manning was appointed in December 2002. Plaintiff himself states that "Mr. Garfunkel and Dr. Fletcher chose to leave the position unfilled." (Pl.'s Opp. at 6.) Leaving Dr. Hussain as Acting Chief changed nothing about his employment situation and did not foreclose the possibility that he would become permanent chief at a later date. Thus, the Court concludes that plaintiff could not have suffered an adverse action until Dr. Manning was promoted to Chief of Radiation Therapy.

Plaintiff makes much of the fact that "VA regulations regarding probationary status limits an appointment to an 'Acting' position to 90 days; however, Dr. Hussain served in the capacity of Acting Chief for four and a half years." (Pl.'s Opp'n at 5.) Plaintiff, however, cites no regulation to this effect, and the Court's research has found none. Even if such a regulation does exist, it is irrelevant to whether plaintiff suffered an adverse action, where the key question is whether the employee suffered an "objectively tangible harm." *Brody,* 199 F.3d at 457.

18. Defendant also disputes that Dr. Hussain was "qualified" for the position. (Def.'s Reply at 3.) As Acting Chief for four and half years, however, Dr. Hussain must have been at least minimally qualified for the position. At this stage, plaintiff need not show more.

dant to proffer a legitimate, nondiscriminatory reason for its employment action. The hospital's reasons for selecting Dr. Manning over Dr. Hussain for the position of Chief of Radiation Therapy are similar to those underlying the selection of Dr. Barth to be Chief of Radiology. "The hospital appointed Dr. Manning as chief of radiation therapy because she was competent and proficient in managing the staff. Hospital administrators knew Dr. Hussain to be ineffectual." (Def.'s Reply at 6; *see also* Fletcher Aff.; Garfunkel Aff.) And in fact, at this point in time, administrators had even more reason to be concerned about Dr. Hussain's inadequate performance than they did at the time of Dr. Barth's appointment in 2000. A report from Dr. Krasnow (Chief of Oncology) to Dr. Fletcher in June 2002 revealed that although Dr. Hussain had a "fund of knowledge... adequate to manage oncology patients... he rarely participates in conferences unless specifically asked a question ... his notes reveal minimum interaction [with patients] in most cases... [and he] does not initiate any research proposals and offers no input into proposed trials." (Krasnow Aff. Att. (memo re: Clinical Services Provided by Dr. Hussain.)) It also stated that, to Dr. Krasnow's knowledge, Dr. Hussain did not have a university appointment. Dr. Barth's July 2002 evaluation (approved by Dr. Fletcher) noted numerous problems with Dr. Hussain's performance, from record-keeping to punctuality to "heated verbal exchanges with his co-workers" [19] (Def.'s Ex. 2 at 3.) These types of concerns led Dr. Barth, in consultation with Dr. Fletcher, to appoint Dr. Manning as Chief of Radiation Therapy. (*See* Barth Aff.)

Defendant has met its burden of articulating a legitimate, nondiscriminatory reason for its failure to select Dr. Hussain for the position of Chief of Radiation Therapy, *i.e.*, that Dr. Manning was better qualified. The burden now shifts back to plaintiff to show that defendant's proffered reasons are pretextual. Plaintiff fails to carry this burden since he cannot show that he had credentials so superior to those of Dr. Manning as to raise an inference of discriminatory motive by either Dr. Barth or Dr. Fletcher.

Dr. Hussain cites his twenty-six years of experience at VAMC as compared with Dr. Manning's one and a half years, as evidence of pretext.[20] While this is indeed a stark contrast, it is not necessarily relevant to the two doctors' relative qualifications for the position of chief. *See Horvath v. Thompson*, 329 F.Supp.2d 1, 8 (D.D.C.2004) (choosing employee with seven years experience over plaintiff, who had twenty years experience, was within selecting official's prerogative); *Park v. WMATA*, 892 F.Supp. 5 (D.D.C.1995) (supervisor's decision based on capability rather than seniority did not raise inference of discrimination). Defendant demonstrates that Dr. Manning had been

---

**19.** Plaintiff claims that this performance evaluation was prepared by Drs. Barth and Fletcher in retaliation for plaintiff's filing of an EEO claim. Even if this is arguably likely, which it is not, other evidence corroborates Dr. Barth's comments. (*See* Def.'s Ex. 2 at 8 (incident report re: outburst at meeting); Krasnow Aff.; Manning Aff.; Barth Aff.)

Plaintiff also makes much of the discrepancy between Drs. Fletcher and Barth's evaluation and those of Dr. Lunzer, his former supervisor. (Pl.'s Opp. at 27.) However, the fact that a previous manager found that plaintiff had met or exceeded expectations does not, by itself, establish that a subsequent manager's evaluation of employee's performance was discriminatory. *Cruse v. G&J USA Publ.*, 96 F.Supp.2d 320, 329–30 (S.D.N.Y.2000).

**20.** He also refers repeatedly to the fact that Dr. Manning was at least ten years younger. Dr. Manning's age has no bearing on her qualification to be chief.

working in the field of radiation therapy since 1986, was affiliated with Georgetown Hospital, and was joint author of a number of publications. (Manning Aff. and Att. (Manning Resume).) Most importantly, Dr. Manning, had proven herself to be a capable administrator, whereas plaintiff had, in the hospital administration's view, had "a number of difficulties in managing and communicating" as Acting Chief. (Barth Aff. ¶ 4.) In light of these concerns, the choice between Dr. Manning and Dr. Hussain was not so obviously lopsided as to create an inference of discrimination under *Stewart* and *Aka*.[21]

Viewing the evidence in the light most favorable to plaintiff, his superiors' decisions not to appoint him as either Chief of Radiation Therapy or Chief of Radiology were rooted in valid and documented concerns regarding his performance and not in any animus towards his race, religion, or national origin. No reasonable factfinder could conclude otherwise. Therefore, the Court grants summary judgment as to the plaintiff's claim of discrimination.

## III. Retaliation

Plaintiff also claims that Mr. Garfunkel, Dr. Fletcher, Dr. Barth, and Dr. Manning retaliated against him for filing EEO complaints in 2000 and 2001. (Pl.'s Opp'n at 25–32.) In order to establish a *prima facie* case of retaliation, plaintiff must demonstrate that: (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *Brody*, 199 F.3d at 452. The legal standard for "adverse actions" is the same for a retaliation claim as for a discrimination claim. In other words, an "employment decision does not rise to the level of an actionable adverse action ... unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker*, 102 F.Supp.2d at 29.[22] With respect to the third prong, where an employer knew of the employee's protected activity, "very close" temporal proximity between a protected activity and an adverse action suffices to show a causal connection between the two. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing with approval cases finding temporal proximity of four and three months insufficient to demonstrate a causal connection); *Cones*, 199 F.3d at 521; *Broderick v. Donaldson*, 2004 WL 2166165, at *5 (D.D.C. Sept.20, 2004). Once the requisite *prima facie* showing has been made, the same burden shifting analysis used for discrimination claims applies. *See Cones*, 199 F.3d at 520–21.

Plaintiff's filing of an internal EEO complaint on November 29, 2000 and a charge of employment discrimination with the EEOC on February 14, 2001 were protected activities, thereby satisfying the first prong. As to the second prong, plaintiff alleges a litany of adverse actions: (1) his nonselection for Chief of Radiology Therapy; (2) reporting to the

---

**21.** Nor does the fact that Dr. Manning was certified only in Radiation Oncology,whereas Dr. Hussain was certified in Radiology and Therapeutic Radiology, raise such an inference. Dr. Manning's certification was sufficient to qualify her to be Chief of Radiation Therapy.

**22.** Plaintiff's claim that an adverse action is "any action reasonably likely to deter protect-

ed activity" is not the law in this Circuit. (Pl.'s Opp'n at 23.) Moreover, none of the cases cited by plaintiff to support this assertion deviates from the rule that an adverse action must affect the "terms and conditions of employment." *See, e.g., Drake v. Minn. Mining and Manuf. Co.*, 134 F.3d 878, 886 (7th Cir.1998).

NPDB; (3) denial of special pay; (4) denial of clinical privileges; (5) being subjected to "scrupulous[ ] monitor[ing];" (6) poor performance evaluations; (7) denial of medical leave; (8) "intentional delay in forwarding supervisor's letter for retirement purposes"; (9) "denial of counsel [23] and failure to provide written retirement options as requested;" and (10) "denial of access to official personnel file." [24] (Compl. ¶ 18.) Plaintiff repeats the special pay allegation in a separate paragraph entitled "Constructive Discharge; Denial of Special Pay." In his opposition, plaintiff additionally alleges (11) "Harrassment/Threats of Termination" and (12) "Harrassment/Fostering Insubordination"

as retaliatory actions, although these are also included in plaintiff's hostile work environment claim. (Pl.'s Opp'n 28–29; Compl. at 14–17.)

■■■ Of these actions, only the nonselection, poor performance evaluations, and threats of termination are even arguably "adverse actions." Though reporting to the NPDB, denial of special pay, revocation of clinical privileges, or denial of medical leave might each be an adverse action in some circumstances, plaintiff misstates the undisputed facts underlying each of these claims. In fact, none of these four alleged retaliatory acts seems to have actually occurred.[25] Monitoring of an em-

23. Plaintiff alleges that HR personnel "refused to allow Dr. Hussain's legal representative to ask questions" during a meeting about his retirement options. (Pl.'s Opp'n at 32.)

24. Plaintiff alleges that HR personnel could not produce his personnel file on one occasion when he requested it. Plaintiff does not allege that he asked for it repeatedly or even more than once.

25. As discussed *supra* at pp. 91–92, the hospital referred plaintiff's name to the Peer Review Panel while recommending that he *not* be reported to the NPDB. The record clearly shows that plaintiff's name was cleared. (Pl.'s Ex. CC.) Plaintiff thus cannot use this action as a basis for a retaliation claim. *Walker*, 102 F.Supp.2d at 29; *see also Stewart v. Evans*, 275 F.3d 1126 (C.A.D.C.2002) (temporary humiliation or loss of reputation does not constitute an adverse employment action); *Dickerson v. SecTek, Inc.*, 238 F.Supp.2d 66, 80 (D.D.C.2002) (temporary exclusion of employee from list of award recipients did not amount to adverse action).

Plaintiff concedes that what he terms a "denial" of special pay was in fact the result of his own failure to renew his special pay contract. (Pl.'s Opp'n at 33; Hussain Dep. at 105–06.) He states that the contract was normally renewed automatically, but blames the problem in 2001 on Human Resources. (*Id.*) As to the actual subjects of the EEOC complaint, plaintiff alleges only that "both Mr. Garfunkel and Dr. Fletcher refused to

assist Dr. Hussain in correcting this error." (Pl.'s Opp'n at 33.) Failure to assist an employee with an error of someone else's making (possibly the employee's own) cannot possibly be an adverse employment action.

Dr. Hussain's clinical privileges were modified in 2003, but not revoked. They were renewed for three months instead of the normal two years. The hospital permitted him to continue practicing, but required him to provide documentation as to his interactions with patients. (Def.'s Ex. 4 at 7.) The documentation was considered necessary because the hospital had received complaints from patients, and Dr. Hussain's colleagues had observed that he did not seem to be providing adequate follow-up care. (Barth Aff.; Manning Aff.) Where "none of the restrictions relate[ ] to job responsibilities or job title and all appear rationally related to the explanation given for their imposition," restrictions imposed on an employee "do not amount to adverse employment actions." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996) (not permitting plaintiff to start work early in the morning, while allowing other employees to do so, was not adverse employment action where plaintiff's whereabouts were unknown for long periods of time.)

And, as the Court has already explained *supra* at pp. 92–93, plaintiff was not in fact "denied" medical leave, but failed to comply with Dr. Manning's request that he provide additional paperwork. Even if Dr. Manning's treatment of Dr. Hussain as being AWOL was

ployee cannot be an adverse action since it is part of the employer's job to ensure that employees are safely and properly carrying out their jobs. This should be especially obvious in a hospital setting. Nor is failure to address "insubordination" of other employees an adverse employment action. The remaining three alleged retaliatory acts (# 8–# 10) are too *de minimis* to constitute adverse actions.[26] As such, the Court need only address the alleged "demotion," performance evaluations, and "threats of termination."

## A. Demotion

■ Plaintiff alleges that " '[o]n the heels' of Dr. Hussain's February 14, 2001 EEOC charge, Drs. Fletcher and Barth began a search for a doctor to replace him [and had hired Dr. Manning by June 2001.]" (Pl.'s Opp'n at 25.) Temporal proximity between an employer's action and the employee's protected activity is, however, only relevant if the employer's conduct amounts to an "adverse action". As defendant correctly notes, "[p]laintiff has failed to adequately explain how the hospital's hiring of another [staff] physician in radiation therapy to assist with the workload of the department could possibly be construed as somehow detrimental to Dr. Hussain." (Def.'s Reply at 7.) Plaintiff states, "Dr. Barth specifically sought an African–American doctor to fill the newly created staff physician position as a means of weakening Dr. Hussain's November 2000 EEO Charge," and that Dr. Barth only seriously considered African–American applicants for the position. (Pl.'s

Opp'n at 14.) Finding this conduct to qualify as an adverse action on the basis plaintiff suggests would have the perverse result that employers could be sued under Title VII for recruiting and hiring minority applicants subsequent to the filing of an EEOC charge of discrimination.

■ Unlike her initial hiring in the fall of 2001, Dr. Manning's promotion to the position of Chief of Radiation Therapy in December 2002 is, as previously held, an adverse employment action. Although it did not affect Dr. Hussain's (or Dr. Manning's) pay or grade, losing responsibility for leading the department was arguably a material change in Dr. Hussain's working conditions. *See Burke v. Gould*, 286 F.3d 513, 522 (D.C.Cir.2002) ("We have no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action. . . .").

Plaintiff next must show a causal connection between his protected activity and Dr. Manning's promotion to chief. Since the promotion occurred in December 2002 and plaintiff's original protected activity occurred on February 14, 2001, there is a serious question as to whether plaintiff can show a causal connection based on temporal proximity. *Clark County School Dist.*, 532 U.S. at 273, 121 S.Ct. 1508 (requiring "very close" temporal proximity). Under *Singletary v. Dist. of Columbia*, the inquiry into temporal proximity is not limited to the date of the original filing of a discrimination-related action, but can extend to "ongoing pursuit of discrimination claims."

---

an adverse action, plaintiff has not offered any evidence, or even any argument, of causal connection between this action and any protected activity.

**26.** Title VII is not meant to remedy "[m]inor and even trivial employment actions," such as a delay in paperwork. *Principi*, 257 F.3d at 818. On the contrary, "the objectively tangi-

ble harm requirement guards against both judicial management of business practices and frivolous suits over insignificant slights." *Id.* (internal quotation marks and citations omitted). Furthermore, the supposed "retaliatory" actions were taken by the HR department, not the alleged discriminating officials—Drs. Barth, Manning, Fletcher and Mr. Garfunkel.

351 F.3d 519, 525 (D.C.Cir.2003). Since plaintiff was still pursuing his claims in 2002, he may be able to establish a causal connection. (*See* Pl.'s Ex. OO (Sept. 16 2002 letter from Dr. Barth to Dr. Hussain re: hiring of counsel).) However, even assuming that plaintiff could do so, his claim must be rejected.

The Court has already concluded in relation to plaintiff's discrimination claim that the hospital has proffered a legitimate, nondiscriminatory reason for this action. The burden shifts back to plaintiff to show that this reason was pretext for retaliation. But as previously established (*see* Section II.B), he has not done this.[27]

### B. Poor Performance Evaluations

■ Plaintiff alleges that after he filed his February 2001 EEOC Charge he received his "first negative evaluation in twenty-six years of service." (Hussain Aff. ¶ 62.) Dr. Hussain's 2001 performance evaluation in fact rated him as "satisfactory." (Pl.'s Ex. NN–2.) The D.C. Circuit has held that "in most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions." *Russell v. Principi*, 257 F.3d 815 (D.C.Cir. 2001); *see Childers*, 44 F.Supp.2d at 20 ("the fact that a plaintiff receives a lower performance evaluation than she thought

she deserved does not constitute adverse action sufficient to make a prima facie case of discrimination and reprisal.") Even performance evaluations that are unequivocally negative are not "necessarily adverse actions." *Brody*, 199 F.3d at 458 (no prima facie case where a poor performance evaluation affected neither the plaintiff's grade or salary.) Given the absence of any showing that his "low satisfactory" rating in 2002 affected plaintiff's conditions of employment,[28] this is not an adverse action.

### C. "Threats of Termination"

■ Plaintiff alleges that Dr. Barth "made numerous threats to Dr. Hussain regarding his employment." (Pl.'s Opp'n at 29.) Specifically, he "asked Dr. Hussain to quit" and told Dr. Hussain he would be " 'kept in a box.' " (*Id.*) The only support provided by plaintiff for these assertions is his own affidavit. (Hussain Aff. ¶ 65.) Even assuming Dr. Hussain is accurately reporting the conversations, they do not constitute adverse actions. For verbal "comments to rise to the level of adverse action, the conduct must be so egregious as to alter the conditions of employment." *Henry v. Guest Servs.*, 902 F.Supp. 245, 252, n. 9 (D.D.C.1995); *see generally, Rabinovitz*, 89 F.3d at 489 (employer's comment that plaintiff could quit if unhappy with the job did not constitute a construc-

---

**27.** Dr. Hussain and Dr. Fletcher had a heated exchange that seems to have resulted, at least in part, from Dr. Hussain's EEO activities. Plaintiff alleges that during the last week in December 2000, Dr. Fletcher "came down very angry" and told him: "you are not going to tarnish my image by doing this." (Hussain Dep. at 50.) However, plaintiff does not draw a connection between this event and his alleged "demotion." Even if Dr. Fletcher was angry about the EEO proceedings, plaintiff has not offered sufficient evidence to show that the appointment of Dr. Manning was based on retaliation rather than her performance in comparison to Dr. Hussain's. *See,*

*e.g., Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 234, 237 (D.C.Cir.1999) (finding that employer's admonition to plaintiff complaining of discrimination to drop her complaint and statement that plaintiff should not "cut off her nose to spite her face" did not rebut the legitimate explanation offered to counter plaintiff's relation claim).

**28.** Although Dr. Manning took his place as chief a few months later, this change was not dependent on the poor performance evaluation, but on Dr. Barth's own assessment of Dr. Hussain's capabilities. (Barth Aff. ¶ 4.)

tive discharge); *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir.2000) (ostracism does not rise to the level of an actionable adverse action).

In sum, the only alleged retaliatory act that could arguably rise to the level of an adverse action is Drs. Barth and Fletcher's appointment of Dr. Manning as Chief of Radiation Therapy in 2002. Since plaintiff cannot make out a claim of retaliation based on this act, summary judgment must be granted on this claim.

## IV. Hostile Work Environment

 A hostile work environment exists when workplace conditions are so suffused with "discriminatory intimidation, ridicule and insult" of such "sever[ity] or pervasive[ness] as to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citations omitted); *see Holbrook v. Reno*, 196 F.3d 255 (D.C.Cir.1999). To make out such a claim, it is not enough to merely show harassment, for "Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex [, race, religion, or national origin]." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C.Cir. 2002). Moreover, "[c]asual or isolated manifestations of a discriminatory environment" may not raise a cause of action." *Park v. Howard University*, 71 F.3d 904, 906 (D.C.Cir.1995).

 Plaintiff also cannot make out a claim for hostile work environment. There is no basis for inferring that any allegedly disparaging conduct by the defendant was based on plaintiff's race, religion, or national origin, or that the allegedly hostile treatment was so severe or pervasive as "to create an objectively hostile or abusive work environment—an en-

vironment that a reasonable person would find hostile or abusive ...." *Harris,* 510 U.S. at 21, 23, 114 S.Ct. 367 (must consider its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance).

## V. Constructive Discharge

 Plaintiff also contends that VAMC officials created working conditions so hostile and intolerable that he was compelled to resign. (Compl. at 18.) "A plaintiff who advances such a compound [hostile-environment constructive discharge] claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, — U.S. —, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). Furthermore, "[t]he working conditions must be more than merely intolerable; they must be intolerable in a discriminatory way." *Chambers v. Am. Trans Air* 17 F.3d 998, 1005–06 (7th Cir.1994). "Constructive discharge thus requires a finding of discrimination and the existence of certain 'aggravating factors.'" *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1558 (D.C.Cir.1997) (quoting *Clark v. Marsh*, 665 F.2d at 1174); *see also Dashnaw v. Pena*, 12 F.3d 1112, 1115 (D.C.Cir. 1994). The Court has already concluded that plaintiff cannot make out a case of discrimination. Thus, summary judgment must also be granted on the constructive discharge claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed with prejudice. A separate Order is attached to this Memorandum Opinion.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** defendant's motion for summary judgment [# 26] is **GRANTED;** and it is

**FURTHER ORDERED** that this case is dismissed with prejudice.

**This is a final appealable order.**